UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

CATHERINE J. VALDRY

VERSUS

MEGAN J. BRENNAN,
POSTMASTER GENERAL

CIVIL ACTION

NO. 15-453-JJB-RLB

## RULING

This matter is before the Court on a Motion for Summary Judgment (Doc. 24) brought by the Defendant, Megan J. Brennan, the Postmaster General of the United States ("Brennan"). The Plaintiff, Catherine J. Valdry ("Valdry"), filed an Opposition (Doc. 28), and the Defendant filed a Reply (Doc. 29). The Court's jurisdiction exists pursuant to 28 U.S.C. § 1331. Oral argument is unnecessary. For the reasons stated herein, Defendant's Motion for Summary Judgment (Doc. 24) is **GRANTED**.

### I. FACTUAL BACKGROUND

The Plaintiff began working as a full-time letter carrier for the United States Postal Service ("USPS") in 1998 at the Istrouma Station.[1] Plaintiff generally worked five days a week.[2] Her scheduled days off were on Sunday and one other day of the week, which rotated from Monday to Saturday in that respective order.[3] During the first hour of her work day, she would organize her case of mail for delivery.[4] After this office work was completed, she would deliver the mail.[5] At the end of the day she would call her supervisor for the final instruction regarding the undelivered mail.[6] The supervisor would either send her additional help or request that she bring the mail back

---

[1] Def.'s Statement of Uncontested Material Facts ¶ 1, Doc. 24-6. The Plaintiff admitted the statements in ¶¶ 1-26 of Def.'s Statement of Uncontested Material Facts. *See* Doc. 28-3.
[2] Def.'s Statement of Uncontested Material Facts ¶ 3, Doc. 24-6.
[3] *Id.*
[4] *Id.* at ¶¶ 4-5.
[5] *Id.* at ¶ 7.
[6] *Id.* at ¶¶ 8-9.

1

to the station.[7] Without overtime, the Plaintiff would generally spend six hours delivering mail.[8] After she was done on her route, she would return to the station and sort any mail that had been returned to the station.[9] This would generally take about five minutes.[10]

In either 2011 or 2012, the Plaintiff began working with Clifford Maryland ("Maryland"),[11] the employee who allegedly harassed her.[12] When Maryland began working at the Istrouma Station in late 2012 he was a clerk supervisor.[13] By October 2013, Maryland had become the Manager of Customer Service.[14] At that time, Mark Stokes ("Stokes"), the Supervisor of Customer Service at the Istrouma Station, was Plaintiff's immediate supervisor.[15] As the morning supervisor at Istrouma, Stokes was responsible for issuing and authorizing overtime to the carriers in the morning before the carriers left to deliver mail.[16] The Plaintiff worked overtime hours during the months of April through July 2014 and April and June 2015.[17] Both Stokes and Maryland had the responsibility to monitor the work performance of Valdry and the other employees.[18]

<u>Harassing Behavior and Complaints</u>

In late 2012, Maryland asked the Plaintiff to go fishing and she declined.[19] Valdry says that for almost a year after she rejected him, Maryland gave her menacing looks when she would return

---

[7] *Id.*
[8] *Id.* at ¶ 10.
[9] *Id.* at ¶ 11.
[10] *Id.*
[11] Maryland retired from the USPS, and the Defendant has been unsuccessful in reaching him. Doc. 29-1. Defendant sent a certified letter to Maryland's last known address and informed Plaintiff that Maryland's last known contact information would be provided upon entry of a protective order. *Id.* The Plaintiff did not file a protective order, and recently noted that she will not call him if this case goes to trial. Doc. 30.
[12] Def.'s Statement of Uncontested Material Facts ¶ 12, Doc. 24-6.
[13] Pl.'s Dep. 20-21, Doc. 24-2.
[14] Def.'s Statement of Uncontested Material Facts ¶ 14, Doc. 24-6; Pl.'s Dep. 24, Doc. 24-2.
[15] Def.'s Statement of Uncontested Material Facts ¶ 13, Doc. 24-6.
[16] *Id.* at ¶ 17.
[17] *Id.* at ¶ 19.
[18] *Id.* at ¶ 20.
[19] Pl.'s Dep. 66-65, Doc. 24-2.

to the station at the end of the day after delivering the mail.[20] Apparently, he would smirk at her, stick his chest out, and lick his lips.[21] Additionally, on at least three occasions from late 2012 to late 2013, he came out to her route and gave her menacing looks.[22]

She called several people at the USPS to complain about Maryland.[23] On September 13, 2013, she had a meeting with Jocelyn Harvey ("Harvey"), the Istrouma Station Manager, and Charlotte Alexander ("Alexander"), her union representative.[24] According to Plaintiff, Harvey said that she would take up any complaints with Maryland.[25]

About a month later, on Maryland's first day as the Manager of Customer Service, he approached Valdry while she was loading her truck.[26] He got close to her and said, "I'm in charge now. I'm gonna get you because your reported me."[27] After this occurred, Valdry apparently had a panic attack. Her doctor diagnosed her with an acute stress reaction, and she was disabled until October 28, 2013.[28]

When Valdry returned to work in late October, Maryland's schedule had changed so that they did not see each other when Valdry returned to the station in the afternoons.[29] Although they did not see each other at the station, between October 2013 and April 2014, Valdry claims that Maryland came out to her route about 20-30 times and looked at her in a menacing way.[30]

---

[20] Pl.'s Decl. ¶ 5, Doc. 28-1.
[21] *Id.*
[22] *Id.* at ¶ 6.
[23] *Id.* at ¶ 7.
[24] *Id.*
[25] *Id.*
[26] *Id.* at ¶ 4.
[27] *Id.*
[28] *Id.* at ¶ 8. In her Opposition, the Plaintiff notes that her Declaration identified the return to work date as November 28, 2013, but this is a mistake. Pl.'s Opp. 2, Doc. 28.
[29] Pl.'s Decl. ¶ 9, Doc. 28-1.
[30] *Id.*

Sometimes he would just look at her and say nothing. Other times, he would ask her how much more mail she had left to deliver.[31]

In April, Valdry claims two harassing events occurred. First, on April 10, 2014, Maryland called Valdry about a customer complaint and without her knowledge allowed the customer to listen.[32] Second, On April 21, he came to her route and gave her menacing looks for two minutes.[33]

In May 2014, Valdry claims that four harassing events occurred. First, on May 5, Maryland approached Valdry's mail truck which was parked at the station and told her that he could "do what he wanted" and that he did not talk to "devils."[34] He apparently made her so nervous that she went to her doctor who excused her from work for two days. On May 8, 2014, her first day back at work, Maryland came to her when she was on her route and called her a "dumb dumb."[35] On May 12, 2014, Maryland accepted two complaints from customers, who said that Valdry had failed to deliver the mail.[36] Finally, on May 19, Valdry told Maryland that she would not be able to complete her route on time. Maryland insisted that she complete it by the end of the work day, and Valdry reported to the Acting Postmaster that she felt threatened by Maryland's request.[37] On May 21, 2014, Valdry met with Timothy Marioneaux ("Marioneaux"), the Acting Postmaster for Baton Rouge, to discuss her problems with Maryland.[38] Since Valdry stated that Maryland's actions were threatening, Marioneaux made the decision to have her allegations investigated by the Threat Assessment Team ("TAT").[39] The TAT's goal is to prevent workplace violence. After an

---

[31] *Id.* at ¶¶ 12-13.
[32] *Id.* at ¶ 14.
[33] *Id.* at ¶ 15.
[34] *Id.* at ¶ 16.
[35] *Id.* at ¶ 17.
[36] *Id.* at ¶ 18.
[37] Def.'s Statement of Uncontested Material Facts ¶ 22, Doc. 24-6
[38] *Id.* at ¶ 22.
[39] *Id.* at ¶ 23.

4

investigation, the TAT concluded that there was no indication of any threat to Valdry.[40] She was informed of these findings in the presence of her union representative.[41]

In June 2014, only one allegedly harassing event occurred. Maryland gave Valdry an Investigative Interview.[42] While delivering mail, Valdry called the police on one of the customers who had lodged a complaint about her previously, claiming that the customer stationed a dog by his mail box.[43] Valdry claims that such an interview was unwarranted because she was justified in calling the police.[44]

For almost a year, it appears that there were no harassing events besides some menacing looks.[45] Valdry has not pointed to any harassing conduct that occurred between June 2014 and April 2015.[46] On April 29, 2015, Maryland passed near her mail case and remarked in a nasty tone of voice that he could do and say whatever he wanted to with respect to Valdry.[47] He returned two minutes later and said "ehm, ehm, you bitch."[48] Valdry claims that this interaction traumatized her and required her to miss work for 30 days.[49]

The Plaintiff filed two formal Equal Employment Opportunity Commission ("EEOC") complaints. On August 18, 2014, she filed her first formal Complaint. The USPS issued a final

---

[40] *Id.* at ¶ 24.
[41] Marioneaux Decl. ¶ 6, Doc. 24-5.
[42] Pl.'s Decl. ¶ 19, Doc. 28-1.
[43] *Id.*
[44] *Id.*
[45] *Id*. at ¶ 20.
[46] Although the Defendant mistakenly referenced April 29, 2014 in its brief, the Court is aware that Defendant meant to reference April 29, 2015. Accordingly, the Court finds that the Defendant has sufficiently addressed the events that occurred on that date.
[47] *Id.* at ¶ 22.
[48] *Id.*
[49] Originally, Valdry also argued that Maryland denied her overtime on various days as a way of retaliating against her for filing complaints. Supp. Compl. ¶¶ 18, 20, 23, and 26, Doc. 19. The Defendant produced the USPS records that showed Valdry worked overtime on some of the contested days. Def.'s Mem. 14, Doc. 24-1 (citing Decl. of L. Laphand, Doc. 24-4). In the face of this evidence, Valdry conceded, in her Opposition, that she was not denied overtime. Pl.'s Opp. 10, Doc. 28. Accordingly, the Court has not considered any actual denial of overtime as allegedly harassing conduct by Maryland as Valdry has conceded that she received overtime.

5

agency decision on April 13, 2015, finding no evidence of discrimination. On September 10, 2015, Plaintiff filed her second formal complaint. The USPS issued a final agency decision on February 4, 2016, finding no evidence of discrimination.

Maryland retired from USPS sometime in 2016. Valdry continues to work there.

## II. STANDARD

Summary judgment should be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[50] An issue is material if its resolution could affect the outcome of the action.[51] A dispute is considered genuine if a reasonable jury could return a verdict for the nonmoving party.[52]

A party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.[53] If the moving party satisfies its burden, the nonmoving party must show that summary judgment is inappropriate by setting forth specific facts showing the existence of a genuine issue concerning every essential component of its case.[54] A court must resolve all reasonable factual inferences in favor of the nonmoving party.[55] However, the nonmoving party's burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.[56]

---

[50] Fed. R. Civ. P. 56(a).
[51] *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citation omitted).
[52] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).
[53] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003) (internal quotation marks and citations omitted).
[54] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003) (internal quotation marks and citations omitted).
[55] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[56] *Willis v. Roche Biomedical Labs, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995) (internal quotations and citations omitted).

### III. LAW & ANALYSIS

#### A. Preliminary Issues

The Plaintiff is only bringing one claim in this case, a Title VII retaliatory hostile work environment claim. Before turning to the parties' arguments, the Court must address two preliminary matters—whether a retaliatory hostile work environment claim is cognizable, and, if it is cognizable, what timeframe the Court should analyze. The Fifth Circuit has not yet decided whether a retaliatory hostile work environment—that is, a hostile work environment animated by retaliatory, rather than gender-based, animus—is a cognizable cause of action under Title VII.[57] However, absent guidance from the Fifth Circuit to the contrary, courts in this circuit have assumed that a cause of action for retaliatory hostile work environment exists.[58] Accordingly, the Court finds that the Plaintiff may pursue her claim for retaliatory hostile work environment.

Additionally, the Court must also determine the timeframe that should be analyzed. The Defendant argues that the Court should only consider the allegedly harassing conduct that occurred between April 10, 2014 and July 29, 2014 as the Plaintiff has specifically stated that her "sued-upon claim" covers that time period.[59] Although the Plaintiff is not particularly clear, she appears to argue that the Court should consider acts that occurred before April 2014 (and outside of the statutory period) because hostile work environment claims are based on repeated conduct, and the Supreme Court has held that as long as "an act contributing to the [hostile work environment]

---

[57] *Tejada v. Travis Ass'n for the Blind*, 617 Fed. App'x 325, 328 (5th Cir. 2015) ("This court has yet to determine whether a Title VII retaliation claim based on a hostile work environment is cognizable."); *Bryan v. Chertoff*, 217 Fed. App'x 289, 293 (5th Cir. 2007); *Fallon v. Potter*, 277 Fed. App'x 422, 424 n. 3 (5th Cir. 2008).
[58] *Baird v. Dep't of the Interior*, Civil Action No. 14-1879, 2016 WL 80629, *5 (E.D. La. Jan. 7, 2016).
[59] Plaintiff's First Supplemental Complaint for Retaliatory Harassment provides that the "sued-upon claim covers the period of April 10-July 29, 2014 and consists of 11 events during which [her supervisor] continued to come to her route and menace her as indicated below." Supp. Compl. ¶¶ 13-26, Doc. 19. Plaintiff's discovery responses stated the same.

7

claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for purposes of determining liability."[60] For the reasons more fully explained below, the Court assumes, for the purposes of this Motion, that it may consider all events that occurred after Plaintiff's internal complaint about her supervisor on September 13, 2013.

As a general rule, in Louisiana, a court may consider all of the harassing conduct that occurs within 300 days before the filing of an EEOC charge for a Title VII claim.[61] However, when a Plaintiff alleges a hostile work environment claim, "as long as an employee files her complaint while at least one act which comprises the hostile work environment claim is still timely, the entire time period of the hostile environment *may* be considered by a court for the purpose of determining liability."[62] In looking at a hostile work environment claim, a court may consider actions outside the statutory period because "[h]ostile environment claims are 'continuing' [in that] they involve repeated conduct so the unlawful employment practice cannot be said to occur on any particular day."[63] A court should apply this continuing violation doctrine to a hostile work environment claim when: (1) the plaintiff demonstrates that the separate acts are related; (2) the violation is continuing; intervening action by the employer will sever the acts that preceded it from those subsequent to it; and (3) the doctrine may be tempered by the Court's equitable powers which must be exercised to honor Title VII's remedial purposes.[64]

In this case, the Court faces the unusual circumstance of what appears to be a single claim that is premised on two different formal EEOC charges. For the first EEOC charge, the statutory period runs from October 22, 2013 (300 days before the filing date) to August 18, 2014 (the filing

---

[60] *Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).
[61] *Heath v. Bd. of Supervisors for the Southern Univ.*, 850 F.3d 731, 736 (5th Cir. 2017).
[62] *Id.* (emphasis added, internal quotation marks omitted, and citation omitted).
[63] *Id.* at 737.
[64] *Id.* at 738.

date). For the second EEOC charge, the statutory period runs from November 14, 2014 (300 days before the filing date) to September 10, 2015 (the date of filing).

The Court need not engage in an extensive analysis about whether it can look at all of the allegedly harassing conduct between September 13, 2013[65] (the first day Valdry engaged in protected activity) and September 10, 2015 (the final date on which she filed a formal complaint). The Court assumes without deciding, for purposes of this Motion, that the continuing violation doctrine applies to Plaintiff's case. Accordingly, the Court views all of the conduct that occurred between these two dates. However, even granting the Plaintiff the benefit of this doctrine, the Court still finds that the Plaintiff has failed to make out a *prima facie* claim of retaliatory hostile work environment.

### B. Retaliatory Hostile Work Environment

Under the provision of Title VII applicable to federal agencies, all personnel actions affecting employees shall be made free from any discrimination based on race, color, religion, sex, or national origin.[66] A *prima facie* case of retaliatory hostile work environment requires a plaintiff to show: (1) she engaged in a protected activity; (2) she was the victim of harassment; (3) there was a causal connection between the harassment and the protected activity; (4) the harassment affected a term, condition, or privilege of her employment (i.e., the harassment was so pervasive or severe as to alter her conditions of employment and create an abusive working environment); and (5) the employer knew or should have known of the harassment and failed to take prompt

---

[65] Due to the fact that this is a claim for retaliatory hostile work environment, the Court can only consider harassing actions that occurred *after* the Plaintiff first complained about employment discrimination. *See Bryan v. Chertoff*, 217 Fed. App'x 289, 294 (5th Cir. 2007) ("To the extent that Bryan complains of…racially insensitive remarks delivered in 2001 as constituting a hostile work environment, these occurred before Bryan filed any employment discrimination complaints."). As discussed herein, the Court finds that the earliest protected activity occurred on September 13, 2013. Accordingly, only conduct that occurred after this date will be considered.
[66] 42 U.S.C. § 2000e-16(a).

remedial action.[67] The USPS argues that the Plaintiff cannot satisfy elements three and four. For the following reasons, the Court finds that the Plaintiff has satisfied her burden on the third element but not the fourth element.

### i. Causation

Under Title VII, protected activities consist of: (1) opposing a discriminatory practice; (2) making or filing a charge; (3) filing a complaint; or (4) testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing.[68] An employee that files an internal complaint of discrimination engages in a protected activity; while opposition to discrimination need not be in formal written form, internal complaints must reference discrimination or other unlawful employment activity in order to be protected.[69]

Although the Plaintiff's brief is confusing, the parties appear to agree that the first protected activity engaged in by the Plaintiff was on September 13, 2013.[70] After reviewing the record, the Court finds that Valdry first engaged in protected activity on this date when she spoke with Harvey, the Station Manager, about Maryland's allegedly discriminatory conduct.

While the Defendant admits that Valdry engaged in protected activity, it disputes that Maryland's harassing conduct was connected to her protected activity. In support of this argument, the Defendant makes two points. First, it argues that Plaintiff's protected activity occurred in September 2013 and her "sued-upon claim" covers the period from April 10 to July 29, 2014. The

---

[67] *Baird*, 2016 WL 80629 at *6. Additionally, "where the harassment is allegedly committed by a supervisor with immediate or successively higher authority, the plaintiff employee needs to satisfy only the first four elements." *Rowe v. Jewell*, 88 F.Supp.3d 647, 673 n.5 (E.D. La. 2015) (citation omitted). Due to the fact that it is undisputed that Maryland was Valdry's supervisor, Valdry only needs to satisfy the first four elements to make out a *prima facie* case.
[68] *Rodriquez v. Wal-Mart Stores, Inc.*, 540 Fed. App'x 322, 328-29 (5th Cir. 2013); *Willis v. Napolitano*, 986 F.Supp.2d 738, 747-48 (M.D. La. 2013).
[69] *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 194 (5th Cir. 2001); *Willis*, 986 F.Supp.2d at 748.
[70] Def.'s Reply 2, Doc. 29 ("Plaintiff's claims regarding when she first engaged in protected activity is confusing. In her sworn Interrogatory Response No. 2, Plaintiff stated that '[t]he main protected act was Plaintiff's refusal to go fishing with Maryland'…However, in her Opposition, Plaintiff stated that her 'single express rejection of Maryland does not qualify as protected conduct in this circuit.'").

Defendant argues that this seven month gap between the protected activity and the claim in this case is insufficient to establish the requisite causal link.[71] The Plaintiff opposes this argument and requests that the Court look at Maryland's actions that occurred immediately after the September 2013 complaint to Harvey rather than just the "sued-upon conduct" in April to July 2014. Due to the fact that the Court is assuming without deciding, for purposes of this Motion, that it may look at all of the conduct that occurred after the September 2013 complaint, it finds that Plaintiff has sufficiently established a temporal connection between the protected activity and the alleged retaliatory harassment. Valdry complained about Maryland in September 2013, and then he approached her on her route about a month later. He apparently said "I'm in charge now. I'm gonna get you because your reported me." This short gap, combined with his statement, shows the requisite temporal proximity between the protected activity and the harassing conduct.

Second, the Defendant argues that Valdry has failed to establish the requisite causal connection between the harassing conduct and the protected activity because she admitted at her deposition that Maryland was not treating her poorly *because* she filed discrimination complaints against him. During her deposition, Plaintiff was asked whether she believed Marlyand's actions were because she "filed the EEO against him or complained against him."[72] Maryland responded and said, "No. I don't—he just one of them men that don't give a damn. 'Oh, I'm going to do what I want to do. I don't care who telling me what to do.' Simple. Bottom line."[73] Defendant asserts that this shows that Maryland's actions were unrelated to the filing of any complaints against him.

---

[71] *See Ajao v. Bed Bath & Beyond*, 265 Fed. App'x 258, 265 (5th Cir. 2013) ("Even assuming Ajao attempted to return to work on 21 July 2001, temporal proximity of four months is not close enough, without additional supporting summary-judgment evidence, to establish a causal connection between the employment action and the protected conduct.").
[72] Valdry Dep. 128, Doc. 24-2.
[73] *Id.*

In order to oppose this argument, Valdry submits a declaration with her Opposition and argues that she was confused by the deposition question. She argues that what she meant to say was that Maryland was harassing her because of her complaints but he was undeterred by such complaints.[74] The law is well-settled that a party cannot defeat a summary judgment motion by filing an affidavit contradicting her own prior testimony.[75] "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."[76]

While this declaration gets awfully close to the line between a proper declaration and a sham declaration, the Court will assume that Valdry was confused by the question, and disregard the "No, I don't," statement. Based on the temporal proximity between the September 2013 complaint and the allegedly harassing conduct that began in October 2013, the Court finds that a reasonable jury could conclude that there was a causal connection between the protected activity and the harassment.

### ii. Severe or Pervasive

The Defendant argues that Plaintiff has failed to make out a *prima facie* claim for retaliatory hostile work environment because, even construing the facts in the light most favorable to the Plaintiff, no reasonable juror could find that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[77]

---

[74] Valdry Decl. ¶ 23, Doc. 28-1.
[75] *Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000).
[76] *Id.* (citation omitted).
[77] *Smith v. Harvey*, 265 Fed. App'x 197, 202 (5th Cir. 2008).

To make out a *prima facie* case for retaliatory hostile work environment, a plaintiff must show that the harassment "affected a term, condition, or privilege of employment."[78] For harassment to affect a term, condition, or privilege of employment it must be so "severe or pervasive" to create an abusive work environment and destroy an individual's opportunity to succeed in the workplace.[79] In order to determine if an environment is abusive, a court must evaluate the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the employee's work performance."[80] This inquiry involves a subjective and objective component.[81] A plaintiff must "subjectively perceive the harassment as sufficiently severe or pervasive, and this subjective perception must be objectively reasonable."[82]

In evaluating the totality of the circumstances, the Court must be cognizant of the fact that "Title VII is not a general civility code for the American workplace."[83] "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."[84] "Offensive and unprofessional behavior" alone does not violate Title VII.[85]

Additionally, in considering the totality of the circumstances, a court should not "disaggregate and separately analyze incidents that are alleged to constitute a hostile work environment."[86] However, a court should undertake to analyze the different categories of

---

[78] *Baird*, 2016 WL 80629 at *6.
[79] *Smith*, 265 Fed. App'x at 202; *Hockman v. Westward Comms., LLC*, 407 F.3d 317, 326 (5th Cir. 2004).
[80] *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993).
[81] *Frank v. Xerox*, 347 F.3d 130, 138 (5th Cir. 2003).
[82] *Id.*
[83] *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999).
[84] *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).
[85] *Kummerle v. EMJ Corp.*, 538 Fed. App'x 373, 374 (5th Cir. 2013).
[86] *Gibson v. Verizon*, 498 Fed. App'x 391, 394 (5th Cir. 2012).

harassment that give rise to the hostile work environment claim.[87] The harassment alleged by Valdry that occurred after she complained about discrimination, included: (1) closely monitoring her work / investigating complaints about her, and (2) staring at her in a menacing way while occasionally making unprofessional comments.

### 1. Monitoring and Investigating

"[C]areful monitoring of an employee's job performance…does not suffice to support a claim for hostile work environment."[88] Additionally, absent evidence of a purely retaliatory animus, internal investigations alone are not sufficiently severe to alter a term, condition, or privilege of employment.[89] Moreover, disciplining employees for performance issues is not a hostile act when consistent with a supervisor's role.[90]

Here, a few of the alleged harassing events relate to internal investigations or performance monitoring: (1) Valdry claims that on April 10, 2014, Maryland called her about a customer complaint and without her knowledge allowed the customer to listen; (2) On May 12, 2014, Maryland accepted two customer complaints against her; (3) On May 19, 2014, Valdry told Maryland that she would not be able to complete her route. Maryland insisted that she complete it by the specified time, and Valdry reported that she felt threatened by Maryland; (4) In June 2014, Maryland gave Valdry an Investigative Interview regarding her calling the police about a customer. She claimed that such an interview was unwarranted because she was justified in calling

---

[87] *See Fallon v. Potter*, 277 Fed. App'x 422, 427-28 (5th Cir. 2008).
[88] *Rowe,* 88 F.Supp.3d at 675.
[89] *McCraney v. Brennan*, Civil Action No. 15-3368, 2017 WL 1383936, *6 (E.D. La. Apr. 18, 2017) (citing *McGarry v. Univ. of Miss. Med. Ctr.*, 355 Fed. App'x 853, 858 (5th Cir. 2009)) (finding that multiple internal investigations conducted by the USPS on an employee were not sufficiently severe or pervasive to sustain a claim for retaliatory hostile work environment).
[90] *Rowe*, 88 F.Supp.3d at 675.

14

the police as the customer had put his dog by the mail box; and (5) Maryland apparently followed Valdry onto her mail route often.[91]

Viewing all of these events, the Court finds that this is not a case where multiple baseless investigations were pressed upon Valdry in an effort to humiliate her, rather Maryland was justified in monitoring and investigating Valdry, his subordinate. Maryland was responsible for observing and monitoring the work performance of his subordinates to ensure that the USPS' goals were met within the context of the limited, eight-hour workday. There is no indication in the record evidence that Maryland was *not allowed* to visit Valdry on her carrier route. In fact, it was his responsibility to monitor her.[92] Accordingly, the monitoring, even if it was more frequent than Valdry would have liked, is not sufficient to support a claim for hostile work environment. Apparently, while monitoring her, Maryland gave Valdry "menacing" looks. However, he never prevented her from completing her work nor did he physically threaten her. Maryland's actions, including his questions about how much mail she had left and his orders to complete her deliveries in the proper time period, were not sufficiently severe enough to create an abusive working environment.

Additionally, Valdry appears to argue that Marlyand retaliated against her by "accepting" baseless complaints. However, the law is clear that investigating and even disciplining an employee does not constitute retaliatory conduct as long as it was warranted. Valdry appears to argue that Marlyand was not warranted in listening to the May 12, 2014 complaints: "On May 12, 2014 Maryland accepted two customer complaints against me. The second was that an

---

[91] All of these events are laid out in Pl.'s Decl., Doc. 28-1.
[92] Valdry concedes that Maryland was responsible for monitoring her (Plaintiff's Statement of Undisputed Facts ¶ 2, Doc. 28-3 (admitting ¶ 20 of Def.'s Statements of Uncontested Facts which states "As the Supervisor and Manager of Customer Service at Istrouma, both Stokes and Maryland had the responsibility to monitor the work performance of the employees."). Additionally, Valdry implies that as Manager of Customer Service, Maryland was allowed to visit her on her route. *See* Pl.'s Decl. ¶ 6, Doc. 28-1 (noting that it was inappropriate for Maryland to visit her on her route when he was a clerk supervisor, but appearing to admit that as Manager of Customer Service he had the authority to visit her route).

unemployment benefits check had been delayed. Maryland should have known that the complaint was baseless because UEB benefits are electronically added to a card."[93] Speaking to Valdry about these complaints cannot form the basis of a retaliatory hostile work environment as Maryland was doing nothing more than fulfilling his role as supervisor. Additionally, absent evidence of retaliatory animus, conducting multiple investigative interviews alone does not constitute a hostile work environment. On June 23, 2014, Valdry called the police on the UEB customer who had complained about her on May 12, 2014. Apparently, the customer put a dog by his mailbox. Valdry argues that Marlyand should have known that carriers are permitted to call the police. The Court is unpersuaded that conducting this interview can form the basis of a hostile work environment as the USPS was warranted in finding out why Valdry felt police presence was necessary on her route.

As to the April 21, 2014 incident, in which Maryland allowed a customer to listen in on a three-way call while Maryland discussed the customer's complaint with Valdry, this was certainly unprofessional. However, "petty slights, minor annoyances, and simple lack of good manners" do not constitute actionable retaliatory conduct.[94] Here, Maryland's frequent monitoring, addressing complaints about Valdry, and directing her to finish her work, are not sufficient to create an objectively hostile work environment.

### 2. Staring and Offensive Language

The bulk of Valdry's retaliatory hostile work environment claim is premised on frequent "menacing" stares that occurred for a little over a year and four "abusive" comments that occurred over the course of about a year and a half: (1) On October 10, 2013, Maryland allegedly said "I'm in charge now. I'm gonna get you because you reported me."; (2) On May 5, 2014, Maryland said

---

[93] Pl.'s Decl. ¶ 18, Doc. 28-1.
[94] *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

to Valdry that he could "do what he wanted" and that he did not talk to "devils"; (3) On May 8, 2014, he called her a "dumb, dumb"; and (4) On April 29, 2015, Marlyand called Valdry a "bitch."

Staring alone cannot amount to severe harassment.[95] In *Wilkinson*, the plaintiff was an employee of the USPS. She sued her employer for hostile work environment based on sexual harassment.[96] To support her proof that the harassing conduct by her co-worker was severe or pervasive enough to affect a condition of her employment, she pointed to five types of conduct: "(1) short, almost daily periods where [her co-worker] stared at her; (2) unnecessary appearances by [her co-worker] in her work area; (3) instances where [her co-worker] would follow her as she went to replace full mail bags with empty ones; (4) an instance where [her co-worker] did not back up to allow the plaintiff and her friend to pass, and then touched the plaintiff on her arm; and (5) an instance where [her co-worker] shook a rod in the plaintiff's direction for a few seconds."[97] The Fifth Circuit stated that "[a]lthough some of the complained-of conduct apparently occurred frequently, [the co-worker's] relatively mild acts were not so threatening or humiliating as to create a hostile work environment, and his actions should not have prevented [plaintiff] from succeeding in the workplace."[98]

Absent physical threatening, comments that are "boorish and offensive" do not create an objectively hostile work environment.[99] "[W]hile rude and insensitive comments can be offensive,

---

[95] *See Wilkinson v. Potter*, 236 Fed. App'x 892, 894 (5th Cir. 2007).
[96] *Id.* at 893.
[97] *Id.*
[98] *Id.* at 894. Various other courts have held that continually following and staring at an employee did not create a hostile or abusive work environment. *Mast v. IMCO Recycling of Ohio, Inc.*, 58 Fed. App'x 116, 123 (6th Cir. 2003) (holding that being stared at for about six months and followed by a co-worker are not incidents that are sufficiently severe or pervasive enough to be actionable as retaliatory harassment); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1250 (11th Cir. 1999) (en banc) (holding that supervisor's actions in, among other things, continually following and staring at employee did not create a hostile or abusive work environment); *Bishop v. National R.R. Passenger Corp.*, 66 F.Supp.2d 650, 663-64 (E.D. Pa. 1999) (holding that a supervisor's alleged "staring, leering," and comments that he was plaintiff's "stud muffin" were not so severe, pervasive, or detrimental as to constitute a hostile work environment).
[99] *Shepherd v. Comptroller of Pub. Accounts of Tex.*, 168 F.3d 871, 874 (5th Cir. 1999) (holding that offensive comments accompanied by touching that occurred over a period exceeding one year did not affect a term, condition, or privilege of employment).

17

the courts have routinely emphasized that persons must be hardened to a certain amount of uncouth behavior in the workplace, and that sporadic incidents of indecency simply do not create a hostile work environment."[100]

While the "menacing glares" occurred intermittently throughout the entire period from about late 2013 to early 2015, the insults and unprofessional comments were sporadic and isolated. Just as the plaintiff in *Wilkinson* could not premise an objectively hostile work environment on near-daily staring, Valdry cannot premise her hostile work environment claim on the constant staring. Additionally, while the comments Maryland made to Valdry were certainly unprofessional, they only occurred four times over the course of sixteen months. They were too sporadic and isolated to create a hostile work environment.

Looking at the totality of the circumstances—the monitoring, the staring, the discussions about customer complaints, and the sporadic use of unprofessional language—the Court finds that no reasonable jury could find that Maryland created an objectively hostile work environment. While the Court is aware, that subjectively, Valdry perceived the harassment as sufficiently severe or pervasive, as she went to a therapist a few times, psychological counseling is "evidence of subjective offense at best."[101] Objectively, Maryland's conduct here might have been unprofessional at times but it never reached the level of abuse.

Accordingly, the Plaintiff has failed to make out a *prima facie* claim for retaliatory hostile work environment because, even construing the facts in the light most favorable to Plaintiff, no

---

[100] *Madison v. Pala*, Civil Action No. 13-765, 2014 WL 4929000, *4 (M.D. La. September 29, 2014*); Hollins v. Premier Ford Lincoln Mercury*, 766 F.Supp.2d 736, 743 (N.D. Miss. 2011) (holding that alleged conduct was not severe or pervasive to be actionable where plaintiff alleged that her supervisor called her a "black bitch" and a "fucking bitch"); *Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 555 (5th Cir. 1997) (finding that comments such as "I get what I want around here, and I want you," and threatening comments like "you have to work with me," did not create an objectively hostile work environment).
[101] *Bhatti v. Trustees of Boston Univ.*, 659 F.3d 64, 74 (1st Cir. 2011).

reasonable juror could find that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an objectively hostile work environment.

## IV. CONCLUSION

Accordingly, the USPS' Motion for Summary Judgment (Doc. 24) is **GRANTED**

Signed in Baton Rouge, Louisiana, on June 21, 2017.

**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**